BOLGER, Justice.
I. INTRODUCTION
A mother and father divorced, and the superior court awarded "sole legal and primary physical custody of the children" to the mother. The court did so with "reluctance," finding that the mother had "engaged in ... egregious parental alienation," but also finding that the children had become "adjusted ... to life" in the mother's care. The court awarded substantial periods of visitation to the father. It explained that if the mother interfered with visitation, it "w[ould] likely change its custody determination to award ... custody" to the father. Visitation subsequently failed to occur, and the court ordered the mother to show cause. Following a hearing, the court held the mother in contempt and modified the custody decree to give custody to the father.
The mother appeals the modification of custody. She claims she had inadequate notice that custody would be determined at the show-cause hearing and contends that the superior court should have continued the hearing when her counsel withdrew several days earlier. She also claims the court's modification of custody was based on the court's mistaken conclusion that she committed custodial interference, a crime of domestic violence.[1] We conclude that the mother had adequate notice of the hearing and that the trial court did not err when it found that her conduct constituted custodial interference. Accordingly we affirm the superior court's judgment.
II. FACTS AND PROCEEDINGS
A. Background
Regina S. and Michael C. married in 2000, and have two children, both boys, from the marriage.[2] Regina filed for divorce in late 2014. Regina alleged, and the superior court found, that Michael had engaged in domestic violence against her. The court thus awarded temporary physical and legal custody of the children to Regina pending a divorce trial *201 and permanent custody award. The court restricted Michael to supervised visitation. Michael never actually had any supervised visits with the children, however, because in May 2015 - when the visits were to begin - Regina left Alaska and took the boys with her.
B. The Custody Investigation
The superior court appointed a custody investigator to make recommendations concerning a permanent award of custody. The investigator prepared a report and later testified at trial.
Based on interviews with the parties and the children, psychological evaluations of both parties, references from individuals who were familiar with the family, and the parties' family histories, the custody investigator concluded that both parties had "a diminished ability to parent." The investigator believed the children had already been "psychologically scarred" and that the parties' continuing "actions ... [were] likely to cause lifelong emotional damage to" them.
In particular the investigator found that Regina had taken "steps" - such as removing the two boys from the state - that "ensure[d]" that contact between the children and Michael "would be very difficult." As a result, the children had not been in contact with Michael for over 17 months, and neither child wanted any contact with him. The investigator believed that Regina had "facilitate[d] the boys' change in attitude about their father," and she characterized this case as involving "severe parental alienation."
Finding the case to be "very complex[,] ... with no easy answers," the custody investigator recommended - "[w]ith great difficulty" - that Regina "continue to have custody of" the children. The investigator ruled out a shared custody arrangement because "[t]he parents [were] unable to communicate and [were] unlikely to be able to do so in the near future." And because the boys were attending school in Arizona, where Regina was living, the investigator thought it better for them to remain with Regina. The investigator further indicated that this option was preferable because transferring custody of the boys from Regina to Michael would cause them further trauma.
The investigator believed it was important for the children's development that they reestablish a relationship with their father. She recommended that Michael "have visitation during the summers and alternate holidays." She further stated that "if there are not monumental efforts to facilitate contact between the boys and their father, [she] would likely recommend a change of custody." The investigator said any such change of custody should "be done before the start of the school year[3 ]... to avoid further disruption in the [children's] education."
C. The Custody Award
The superior court decreed the parties divorced in March 2016, and it issued a final custody award in June 2016 following trial. In reaching its custody determination the court considered the testimony of the parties and other witnesses, the recommendations of the custody investigator, and psychological evaluations of the parties.
The court addressed each of the statutory factors concerning the best interests of the children[4] in a written order. The court explicitly "discount[ed]" one of the best-interests factors - "the child[ren]'s preference"[5] - because the court found that the boys' preference that they not have contact with their father was the "result of ... [Regina's] parental alienation." Indeed, the court stated Regina had "engaged in the most egregious parental alienation that the ... court ha[d] ever seen." The court agreed with the custody investigator "that contact between [Michael] and the children is ... important to the children's development."
The court adopted the custody investigator's recommendation and "reluctan[tly]" awarded Regina "sole legal and primary physical custody of the children." The court gave Michael substantial periods of visitation, *202 including the children's summer vacations. The court explained that "[t]here [were] limits to the ... custody award":
If Regina fails to cooperate with [Michael] to ensure that the children have court-ordered visitation ..., the court will likely change its custody determination to award sole legal and primary physical custody of the children to [Michael]. Such a change under those circumstances would be consistent with the custody investigator's recommendation to the court.
D. The Order To Show Cause
The superior court ordered the first period of visitation to begin on July 6, 2016. Regina was required to put the children on a flight so that they could travel from her home to Michael's home in Alaska to spend one month with Michael. She did not do so.
Michael subsequently moved "for an order that Regina ... appear ... and show cause as to why she should not be held in contempt of court for failing to have [the parties'] children in Alaska for visitation." Michael pointed out that "[t]he court stated that it would entertain a change of custody if Regina ... did not make visitation between the boys and [Michael] happen." Regina filed a response in which she claimed that she had "act[ed] in good faith to try to make th[e] travel happen" but that the boys had refused to cooperate. She accused Michael of "leverag[ing] [an] impossible situation into an effort to reverse custody."
On July 19 the court issued an order for Regina to "show cause" at an August 1 hearing "why [she] should not be held in contempt of court for willfully violating the [custody] order." The show-cause order further stated that Regina "should be prepared to advise the court why it should not change custody of the minor children" to Michael.
E. The Withdrawal Of Regina's Counsel
Regina's counsel moved to withdraw before the August 1 show-cause hearing.[6] On July 28 Superior Court Judge William F. Morse, who was not the judge assigned to the divorce and custody case, presided over a hearing on the withdrawal motion. At the hearing, Regina asserted that she did not want her attorney to withdraw but "underst[ood]" that he needed to do so. Judge Morse asked Regina whether she would be attending the show-cause hearing "on [her] own." Regina responded, "I suppose, if I can't get an extension of time." Judge Morse said it was "not really [his] call" whether to continue the show-cause hearing, but he permitted Regina's counsel to withdraw.
F. The Show-Cause Hearing And Custody Modification
The show-cause hearing was held as planned on August 1. At the beginning of the hearing, the superior court remarked - without comment or opposition by Regina - that Regina was "now representing herself." The court explained that the hearing's purpose was to decide whether Regina should be held in contempt and "whether [the court] should order what some experts call a parentectomy, that is, a permanent transfer of custody."
Regina testified first. She asserted that she had done "everything [she] possibly could" to get the boys to board the flight to Alaska, including contacting the police, but that they had been unwilling to do so. She further testified that she had tried to get her children to speak to Michael on the phone but that they had "absolutely refuse[d]." Regina claimed the children were "reasonabl[y]" afraid of their father and had witnessed "[d]omestic abuse their entire lives."
The custody investigator and Michael also testified. The investigator recommended, based on various factors that she explained to the court, that there be "a change of custody" and "that the children have intensive counseling." Michael expressed his concern that if the court allowed Regina to retain custody, she would be unlikely to cooperate with visitation and "[they'll] be right back in court wherever it is [they] are."
After the parties presented evidence and arguments, the superior court found that "there [was] no legitimate explanation for why the visitation didn't occur" and that Regina's testimony about the children witnessing extensive domestic violence was "fantasy." The court held Regina in contempt.
*203 The court also found that Regina had committed the crime of first-degree custodial interference: she had intentionally "h[eld] the children for a protracted period of time" out of the state, and Michael "was the legal custodian" under the June 2016 custody award.[7] The court moreover reasoned that Regina committed two crimes - since there were two children - and that she thus had a history of perpetrating domestic violence.[8] Thus the court considered its "hands ... tied" by the domestic violence presumption[9] and concluded that it had "to take custody away from her immediately." The court also found that Regina posed a "danger of mental harm to the children" and reaffirmed its earlier best-interests analysis.
The court "order[ed] an immediate transfer of custody so that [Michael] [would] have sole legal custody ... and primary physical custody and" Regina would have "supervised visitation." The court stated that it was "essentially following [the custody investigator's] recommendations."
Regina moved for reconsideration and to stay the order, but the court denied the motions. She now appeals.
III. DISCUSSION
A. Regina Received Adequate Notice That Custody Would Be Addressed At The Show-Cause Hearing, And Her Right To Due Process Was Not Violated.
Regina claims that "the superior court erred ... in considering a change in custody" at the show-cause hearing "upon only ten [days'] notice with no prior motion to modify custody having been filed." "Procedural due process under the Alaska Constitution requires notice and opportunity for hearing appropriate to the nature of the case."[10] The "adequacy of the notice and hearing afforded a litigant" is a question of constitutional law "to which we apply our independent judgment."[11]
We conclude that under the circumstances Regina had timely and adequate notice that the superior court would consider modifying the custody award at the August 1 show-cause hearing. Most significantly, the July 19 order to show cause stated that Regina "should be prepared to advise the court why it should not change custody of the minor children" to Michael. The order thus provided express notice 13 days before the show-cause hearing that permanent custody would be addressed at the hearing.
Even before July 19, Regina should have been aware - and the record reflects she was in fact aware - that the court would reevaluate custody as a result of the children's failure to visit their father. The court stated in its June 2016 custody order that it "w[ould] likely change its custody determination" if Regina failed to comply with the order's visitation terms, and Michael raised the possibility of custody modification in his motion for an order to show cause. Regina acknowledged in her response to Michael's show-cause motion that Michael was attempting to "reverse custody."
*204 Regina therefore had a sufficient amount of time to prepare - at least 13 days - and could not reasonably have been surprised by the court's decision to address custody at the show-cause hearing. The period of notice was particularly appropriate in light of the custody investigator's recommendation that the court resolve the custody issue in an expedited manner - before the start of the school year in August - so that the children's education would not be disrupted.[12]
In arguing that her right to due process was violated, Regina relies on VinZant v. Elam[13] and Lashbrook v. Lashbrook .[14] In VinZant the superior court modified the parents' permanent custody arrangement following a show-cause hearing, and in Lashbrook the superior court issued a permanent custody award following a hearing on a petition for a domestic violence protective order.[15] In each case we reversed, concluding that the superior court had not given the parents notice that permanent custody was in issue and had failed to make findings on whether a modification of custody was in the children's best interests.[16]
These cases are not helpful to Regina. Unlike the parents in VinZant and Lashbrook , Regina received a show-cause order that explicitly indicated custody would be addressed at the hearing. And unlike in VinZant and Lashbrook , the superior court in this case addressed the best-interests factors by reaffirming the findings that it had made a little over a month earlier in the June 2016 custody award.[17]
Regina further argues that the present case is like Cushing v. Painter .[18] In that case we reversed a permanent custody award where the superior court had given the parents only five days' notice and had informed them only that "interim" custody was in issue.[19] The present case is distinguishable because Regina had at least 13 days' notice - not 5 - of the hearing. And Regina, unlike the parents in Cushing , could not have reasonably been under the impression that only temporary custody would be addressed at the hearing. She should have known from the conditional nature of the June 2016 custody award and from the language in the show-cause order that permanent custody was in issue.
Regina claims she was "forced to proceed without an [a]ttorney" at the show-cause hearing due to her attorney's last-minute withdrawal, and she asserts that the lack of counsel "compounded" the supposed deficiencies with the notice.[20] But Regina never made a showing to the superior court that she lacked time or resources to retain replacement *205 counsel. Indeed, although her attorney withdrew mere days before the show-cause hearing, Regina received notice of the need to seek out replacement counsel several weeks earlier when her attorney filed his motion to withdraw. And Regina is an educated professional (a medical doctor) who had the assistance of her attorney in preparing a written response to the motion to show cause. Even if she was "forced" to proceed self-represented at the hearing, her right to due process was not violated.[21]
We finally point out that a "party raising a due process objection must show that [she] has suffered actual prejudice."[22] Regina has not made such a showing. She vaguely asserts that the supposedly short notice and her lack of counsel rendered her unable to present "additional information regarding [Michael's] behavior following the original custody trial." But Regina had an opportunity to testify about Michael and cross-examine him at the show-cause hearing. And as Michael points out, "[i]t is an undisputed fact that [Michael] had no contact ... with the children or [Regina] after the custody trial."
Regina also asserts she was unable "to present witnesses from Arizona where [they] had been ... doing well." But within ten days of the modification of custody, Regina obtained statements from several witnesses, which she provided with her motions for reconsideration and for a stay. There is no basis in the record to conclude that Regina could not have had these witnesses testify telephonically at the show-cause hearing.
Regina therefore has not established a due process violation or prejudice.
B. The Superior Court Was Not Required To Continue The Show-Cause Hearing.
Regina claims that the superior court should have continued the show-cause hearing following the withdrawal of her attorney. We review denial of a continuance for abuse of discretion.[23] Failure to grant a continuance "is an abuse of discretion 'when a party [is] deprived of a substantial right or seriously prejudiced.' "[24] We discern no abuse of discretion on this record.
At the hearing concerning her attorney's motion to withdraw, Regina told Judge Morse, the judge handling the attorney withdrawal motion, that she "suppose[d]" she would be attending the show-cause hearing on her own if she could not "get an extension of time." This arguably constituted an implicit motion for a continuance.[25]
Since Judge Morse was presiding at this withdrawal hearing, he stated that it was "not really [his] call" whether to continue the show-cause hearing. Thus the court effectively reserved ruling on Regina's implicit motion. It was therefore incumbent on Regina to renew her motion before the judge assigned to the case.[26]
Regina never did so. She did not file a written motion following the withdrawal hearing.[27] And when she appeared at the show-cause hearing she did not orally request a continuance. In fact she did not respond at all when the court remarked that *206 she was "now representing herself." Because Regina did not renew her earlier implicit motion, it does not appear that the judge assigned to the divorce and custody case - the judge who presided over the show-cause hearing - was aware of the motion or of any need to rule on it. And the court was not required to raise the matter of a continuance sua sponte.[28]
C. Regina Committed Custodial Interference.
Regina claims the superior court erred in concluding she committed the crime of custodial interference. The superior court found that she had committed the crime of custodial interference in the first degree. A person who is a "relative" of a child commits custodial interference in the second degree if, "knowing that [she] has no legal right to do so, [she] takes, entices, or keeps th[e] child ... from a lawful custodian with intent to hold the child ... for a protracted period."[29] The relative is guilty of custodial interference in the first degree if she commits the second degree offense and in addition "causes the child ... to be removed from [Alaska]; or kept outside [Alaska]."[30] Regina alleges that the superior court erred when finding two elements of this crime satisfied, arguing that Michael cannot qualify as a lawful custodian and she did not have the required intent.
1. The superior court correctly determined that Michael was a lawful custodian of the children.
Regina argues that, as a matter of law, she could not have committed this offense because under the superior court's permanent custody award she - not Michael - was the "lawful custodian." We disagree.
"We review statutory interpretations de novo."[31] "We interpret statutes according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[32] Our analysis begins with the text of the statute.[33] Alaska Statute 11.41.370(1) defines "lawful custodian" to mean "a parent, guardian, or other person responsible by authority of law for the care, custody, or control of another."
Michael qualifies as a lawful custodian because the superior court made him responsible for the care, custody, and control of the children during the summer. The superior court awarded Michael unsupervised visitation rights with the children from July 6, 2016 through August 6, 2016. During this time the court expected Michael to enroll the children in reunification therapy sessions, and Michael was responsible for the counselor's fees. Additionally the court authorized Michael to travel out-of-state with the children during this and future summer visitations. Considered together, Michael was made responsible by authority of law for the care, custody, and control of the children, thereby making him a lawful custodian for purposes of AS 11.41.370(1).[34]
The dissent opines that the crime of custodial interference does not apply when a parent *207 has only visitation rights. This evaluation is partly based on the existence of a separate offense of failure to permit visitation with a minor under AS 11.51.125.[35] But the elements of these two crimes differ greatly. Only a custodian may commit failure to permit visitation, unlike custodial interference, which may be committed by anyone.[36] And failure to permit visitation requires violation of a custody order - unlike custodial interference, which one parent may commit against the other even when there is no custody order.[37] More importantly, to commit custodial interference a person must take, keep, or entice the child from a lawful custodian with the intent to hold the child for a protracted period with no legal right to do so . Failure to permit visitation has no similar intent element or duration element.
If Regina had kept the children from Michael intending to hold them only for a short period of time, then Regina might have committed only failure to permit visitation but not custodial interference. However, the superior court found that Regina kept the children from Michael, intending to hold them for a protracted period when she had no legal right to do so. Under these circumstances, the superior court could reasonably conclude that Regina committed custodial interference.
2. The superior court did not clearly err when it found that Regina intentionally kept the children for a protracted period.
To commit the crime of custodial interference, a person must not only take, entice, or keep a child from a lawful custodian but also "know [ ] that [he or she] has no legal right to do so" and "inten [d ] to hold the child ... for a protracted period."[38] Regina claims that "based on the evidence presented, it was not shown [that she] intended to hold the children out of state." Instead she argues that she "did everything she could do to get the then 14 and 15 year old boys to board the plane." The superior court did not clearly err in discounting this evidence.
"A factual finding is clearly erroneous if 'a review of the entire record leaves us with a definite and firm conviction that the trial court has made a mistake.' "[39] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[40]
The superior court made no such mistake here. The court expressly found Regina not credible and that Regina's supposed efforts to put her children on a plane to Alaska were all for show:
She got to the airport, made sure the police knew where she was at and all of that, but really didn't do the things that were necessary to get the children on the plane, or encourage them to really get on the plane, or perhaps explain to them what the consequences would be if they do not get on the plane.
The superior court had previously found that "Regina ha[d] brainwashed the children into *208 believing that Michael is a monster." The court implicitly relied on this earlier finding in concluding that Regina was lying about being unable to convince the children to board the airplane: "I understand [Regina] has lots of explanations, teenage boys, who she says she can't control, I think she can control them, I think she has been controlling them." Reviewing the record as a whole, we find that the court did not clearly err when it found that Regina intentionally kept the children with her during the summer.
IV. CONCLUSION
For the foregoing reasons we AFFIRM the court's decision to award primary physical custody and sole legal custody to Michael.

AS 11.41.320 -.330, 18.66.990(3)(A).

We use initials in lieu of the parties' last names to protect the family's privacy.

The investigator submitted her report in early May 2016, and the court later issued its custody award on June 30, 2016. The school year would begin in August.

See AS 25.24.150(c).

AS 25.24.150(c)(3).

Counsel filed the motion on July 8.

AS 11.41.330(a)(1) ("A person commits the crime of custodial interference in the second degree if ... being a relative of a child ... and knowing that the person has no legal right to do so, the person takes, entices, or keeps that child ... from a lawful custodian with intent to hold the child ... for a protracted period."); AS 11.41.320(a) ("A person commits the crime of custodial interference in the first degree if the person violates AS 11.41.330(a)(1) and causes the child ... to be ... removed from the state[ ] or ... kept outside the state.").

AS 25.24.150(h) ("A parent has a history of perpetrating domestic violence ... if the court finds that ... the parent has engaged in more than one incident of domestic violence."). Per AS 18.66.990(3)(A), "domestic violence" includes "a crime against the person under AS 11.41" that is an "attempt to commit ... by a household member against another household member."

AS 25.24.150(g) ("There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child.").

Debra P. v. Laurence S. , 309 P.3d 1258, 1261 (Alaska 2013) (quoting Lashbrook v. Lashbrook , 957 P.2d 326, 328 (Alaska 1998) ).

Id. at 1260 (quoting Lashbrook , 957 P.2d at 328 ).

See Dennis O. v. Stephanie O. , 393 P.3d 401, 411 (Alaska 2017) (citing In re K.L.J. , 813 P.2d 276, 279 (Alaska 1991) ) (indicating that governmental interest in protecting children can be taken into account in assessing what process a parent is due).

977 P.2d 84 (Alaska 1999).

957 P.2d at 326.

VinZant , 977 P.2d at 85 ; Lashbrook , 957 P.2d at 327-28.

VinZant , 977 P.2d at 86-87 ; Lashbrook , 957 P.2d at 329-30.

Though the court reaffirmed its previous best-interests findings, it also noted that Regina's failure to facilitate visitation was a new development weighing in favor of custody modification. Regina points out that to modify custody, the superior court must also find that there has been a "substantial change in circumstances." Bagby v. Bagby , 250 P.3d 1127, 1129 (Alaska 2011) (citing AS 25.20.110(a) ). Although the superior court did not use those words, it found that Regina intentionally and completely deprived Michael of contact with his children in violation of the custody award, behavior which constituted a substantial change in circumstances as a matter of law. See Graham R. v. Jane S. , 334 P.3d 688, 694-95 (Alaska 2014). We discuss this in more detail below in Part III.D.

666 P.2d 1044 (Alaska 1983).

Id. at 1046.

Regina does not argue that the superior court abused its discretion in allowing her counsel to withdraw. See Willoya v. State, Dep't of Corr. , 53 P.3d 1115, 1119 (Alaska 2002). She insinuates that the court did something improper, claiming that the court permitted counsel to withdraw "following an in-chambers consultation ... which excluded" her. But the record reflects that Regina was present during this discussion, and Regina has not requested that we review the sealed part of the record documenting the discussion. See Raris v. Greek Corner , 911 P.2d 510, 511 n.5 (Alaska 1996) (indicating that a party waives an argument if she fails to cite facts or otherwise support the argument).

See Dennis O. v. Stephanie O. , 393 P.3d 401, 409 (Alaska 2017) ("[S]elf-represented ... parents facing opposing parents represented by private counsel are not, as a class, deprived of due process rights solely because they do not have counsel."). We point out that Regina has not contested the contempt ruling. See Bustamante v. Alaska Workers' Comp. Bd. , 59 P.3d 270, 274 (Alaska 2002) (noting the right to counsel in a contempt proceeding).

Moody v. Royal Wolf Lodge , 339 P.3d 636, 643 (Alaska 2014).

Clementine F. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 375 P.3d 39, 43 (Alaska 2016).

Shooshanian v. Dire , 237 P.3d 618, 623 (Alaska 2010) (quoting Siggelkow v. Siggelkow , 643 P.2d 985, 986-87 (Alaska 1982) ).

See Sengupta v. Univ. of Alaska , 139 P.3d 572, 581 (Alaska 2006) (referring to "our lenient approach" in construing motions by self-represented litigants). We note that Regina was technically not self-represented at that time but was in fact represented by counsel.

See id. ("[T]o preserve a claim based on a superior court's failure to rule on a motion, a party must make every effort to request and obtain a ruling before proceeding to trial." (quoting Taylor v. Johnston , 985 P.2d 460, 467 (Alaska 1999) )).

Regina also did not file a written motion for continuance before the withdrawal hearing, even though she was represented by counsel at that time.

For the reasons set forth above, Regina has also failed to demonstrate that she was prejudiced by the failure to continue the show-cause hearing.

AS 11.41.330(a)(1).

AS 11.41.320(a).

Michael W. v. Brown , 433 P.3d 1105, 1109 (Alaska 2018) (citing Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 394 P.3d 543, 550 (Alaska 2017) ).

Id . (quoting Marathon Oil Co. v. State, Dep't of Nat. Res. , 254 P.3d 1078, 1082 (Alaska 2011) ).

See City of Valdez v. State , 372 P.3d 240, 249 (Alaska 2016).

Regina argues that our discussion of custodial interference in Graham R. v. Jane S. should control this case because we noted a distinction between parents with custodial rights and visitation rights when interpreting "lawful custodian." 334 P.3d 688, 694 (Alaska 2014). In that case a father with custodial rights held a child out of state, preventing the mother from exercising her weekend visitation rights. Id . at 694. We reviewed the superior court's finding that this was a change in circumstances justifying a modification of custody. Id . at 694-95. We held that the father's substantial interference with the mother's visitation rights constituted a substantial change in circumstances justifying the modification, but declined to base our holding on AS 11.41.330(a). Id . Because our brief discussion of AS 11.41.330(a) was not necessary to the holding in the case, we consider it dicta. See Scheele v. City of Anchorage , 385 P.2d 582, 583 (Alaska 1963) ("We look upon what we said in [a previous] case ... as obiter dictum, since it was not necessary to the decision in that case."), superseded by statute on other grounds , AS 09.65.070.

Alaska Statute 11.51.125(a) provides:
A custodian commits the offense of failure to permit visitation with a minor if the custodian intentionally, and without just excuse, fails to permit visitation with a child under 18 years of age in the custodian's custody in substantial conformance with a court order that is specific as to when the custodian must permit another to have visitation with that child.

See AS 11.41.330(a).

See Vachon v. Pugliese , 931 P.2d 371,377 (Alaska 1996) ; Strother v. State , 891 P.2d 214, 223-24 (Alaska App. 1995).

AS 11.41.330 (emphases added).

Faulkner v. Goldfuss , 46 P.3d 993, 996 (Alaska 2002) (quoting Evans v. Evans , 869 P.2d 478, 479 (Alaska 1994) ).

Limeres v. Limeres , 320 P.3d 291, 296 (Alaska 2014) (quoting Sheffield v. Sheffield , 265 P.3d 332, 335 (Alaska 2011) ).