*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| EDNA K., | ) | |
| | ) | Supreme Court No. S-17380 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-14-02794 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JEB S., | ) | |
| | ) | No. 7467 – July 17, 2020 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Christine M. Pate, ANDVSA Legal Program, Sitka, for Appellant. Eric J. Brown, Law Office of Eric J. Brown, P.C., Homer, for Appellee.

Before: Winfree, Stowers, and Maassen, Justices. [Bolger, Chief Justice, and Carney, Justice, not participating.]

STOWERS, Justice.

I.     INTRODUCTION

Edna K.[1] appeals a child custody modification decision declining to find a change of circumstance even though both parties sought to modify their joint custody agreement. The superior court ruled that Edna was collaterally estopped from presenting

_____

[1]     Pseudonyms are used to protect the parties' privacy.

evidence of Jeb S.'s history of domestic violence because the issue had been "adequately addressed" in the parties' stipulated custody agreement. The superior court's application of collateral estoppel was legal error. We reverse the court's application of collateral estoppel, vacate the court's findings on changed circumstances, and remand for an evidentiary hearing on issues of domestic violence.

## II.    FACTS AND PROCEEDINGS

### A.    2017 Stipulated Agreement

Edna and Jeb never married but had one child together, G.S., in February 2012. The two had a "rocky" relationship and they separated permanently two and a half years after their son's birth. Edna filed a complaint for primary physical custody with shared legal custody in October 2014. Edna was initially self-represented, although the court granted her motion for attorney's fees to level the playing field. In May 2015 Edna filed a motion for interim custody and visitation again, seeking primary physical custody but with shared custody when Jeb was in town. Her motion listed each of the best interests factors in AS 25.24.150(c) and stated that "[t]here is no evidence of domestic violence, child abuse, or child neglect in either parent['s] household." Temporary orders were issued in August 2015, awarding shared legal custody and prescribing an alternating schedule for physical custody taking into account Jeb's work schedule on the North Slope. In September 2015 Edna moved for a custody investigation to address her concerns of "domestic violence" and "control issues," among others. The court granted that motion and ordered Jeb to procure a private custody investigator. The parties continued to quarrel in the period leading up to the custody investigation, with Jeb seeking a long-term protective order against Edna in March 2016.

The private custody investigator met with the parties several times from June through August 2016. The investigator noted that the parties proposed nearly identical custodial arrangements. Rather than attempt to "substantiate or invalidate" the

allegations of domestic violence raised by the parties, the custody investigator's report stated that "50/50 custody . . . is what this investigator tried to reach." The report briefly summarized Jeb's criminal record and past reports of domestic violence, including a 2005 conviction for sexual abuse of a minor. The report contained only a half-page discussion on domestic violence, noting that although Jeb was the subject of a number of restraining orders, Edna's 2015 motion stated that no domestic violence existed. The custody investigator also minimized the severity of Jeb's conviction for sexual abuse of a minor because Jeb later obtained custody of the son born out of that relationship, so the investigator reasoned that "the court [did] not deem him a risk to his own children."[2] The report recommended shared legal custody and varying degrees of shared physical custody, depending on Jeb's work schedule and location.

The parties negotiated a settlement in September 2016 largely incorporating the "50/50 custody" arrangement proposed by both sides. The superior court approved the parties' proposed custody agreement in January 2017. The custody arrangement provided alternating two-week periods of custody when both parents were living in the same area. G.S. was to alternate three weeks with Jeb and two weeks with Edna during summers after he began kindergarten. The agreement also contained provisions for child support and for splitting G.S.'s permanent fund dividend.

---

[2] Raising a similar argument in his written closing argument before the superior court, Jeb appended what he claimed was a 2017 custody modification order "grant[ing] primary physical and sole legal custody of [his other son]." But Jeb's history of domestic violence was never mentioned in the attached exhibit, which in actuality was the magistrate's proposed order and contained no indication whether it had been adopted by the court. Moreover, the primary concern in the magistrate's report was "the significant emotional distress" the son suffered due to domestic violence between his mother and her husband at the time.

## B.     2018 Custodial Disputes

Despite the stipulated custody order the parties' communication continued to deteriorate, and in January 2018 Jeb asked the superior court to hold Edna in contempt for violating the order. Jeb claimed that Edna relocated to Soldotna without consulting him, refused to pay for airfare to facilitate visitation, prevented Jeb from picking up G.S. in Soldotna for visitation, and then moved again to Nenana. Jeb argued that Edna's life was "chaotic and lack[ed] any kind of stability," implying that her successive moves were detrimental to G.S.'s interests. Edna countered that there was no scheduled visitation for the week Jeb claimed he was entitled to visitation, Jeb refused visitation on other dates that she offered, and she could not afford to pay for transportation. Edna submitted text messages specifically refuting Jeb's allegations of non-cooperation, and she additionally alleged that Jeb had dropped G.S. from his insurance plan prior to a medical appointment in January 2018. Edna claimed that it was Jeb who lacked stability as he "has changed live-in partners at least three times since [they] were last in court." The superior court refused to consider Jeb's arguments on G.S.'s best interests and denied his motion in April 2018, because Edna had "at least adequately performed under the custody agreement."

According to Edna, in May 2018 after she dropped off G.S. and his dog with Jeb for a weekend, Jeb subsequently refused to let the dog go back with Edna when she returned to pick up G.S. Jeb kept the dog locked in his trailer each time after that when Edna came to pick up G.S. On June 20, when Edna came to pick up G.S. to attend a family funeral, Jeb was not home and the dog was not locked inside, so Edna took it. This instigated what Edna described as a "ransom" situation where Jeb's girlfriend at the time kept G.S. in the trailer and demanded that Edna return the dog, although she eventually let G.S. go with Edna. The next day, Jeb filed for a short-term protective

order, allegedly "claiming [Edna] had stolen his dog"; the petition was denied, and the petition for a long-term order was later dismissed.

A week later Jeb refused to return G.S. at the end of his three-week visitation period. On June 29 Jeb petitioned for a protective order in G.S.'s name alleging that G.S. was sexually abused by one of the teenage sons of Edna's partner at the time. Although the magistrate judge initially granted an ex parte order, the long-term protective order was later denied as just "another in the parties' long-running battle over [G.S.]" The magistrate judge ordered the parties to return to the prior custody agreement on July 16. Jeb refused and allegedly told Edna that "you can file whatever you want; but [G.S.] is not going back to you."

Edna sought a writ of assistance to enlist the aid of police officers in returning G.S. to her custody. Jeb still refused, and when Edna attended one of G.S.'s counseling appointments, she attempted to leave with G.S. Edna was carrying G.S. when Jeb caught up to them; according to Edna, Jeb initiated a "tug-of-war" in the parking lot, grabbing G.S. "around his stomach" and dragging them both approximately "two car lengths." Edna's mother observed that G.S. had his arms around Edna's neck, "[h]anging on for dear life to his mom." The incident reportedly left G.S. with "a painful effect on his leg." At the August 16 hearing for Edna's writ of assistance, the caseworker assigned to investigate Jeb's allegations noted that G.S. "did not make any disclosures about being a victim of sexual abuse." The court issued a writ of assistance and G.S. was returned to Edna after the hearing, a full month after the magistrate judge ordered his return.

### C.     Motion To Modify Custody And The Superior Court's Findings

On July 30, in response to Edna's motion for a writ of assistance, Jeb moved to modify the custody agreement to grant him primary physical custody of G.S. Jeb again alleged that G.S. was sexually abused while in Edna's custody, although he

claimed "the long-term protective order was denied for reasons [he did not] quite understand." Jeb nonetheless acknowledged that he refused to return G.S. and abide by their prior agreement because Jeb "honestly believe[d]" that G.S. was "not safe with her." Jeb also alleged that Edna had "lied to the court" on several occasions, and that "because she moves around so much . . . [G.S.] has no stability in his life when he's with his mother." In response, Edna stated she "does not oppose modification of custody," but instead proposed that "it is in [G.S.]'s best interests that his mother, not his father be awarded legal and primary physical custody." Edna focused on the parties' "inability to cooperate and share legal custody" as well as Jeb's "pattern of controlling and manipulating behavior." Edna also iterated Jeb's "long and well-documented history [of] domestic violence," which by statute would establish "a presumption against awarding him sole or joint custody."[3] Because both parties agreed that "a substantial change in circumstances" existed, the court decided that the next step was to "just set a best interest hearing."

The court held an evidentiary hearing to determine G.S.'s best interests on September 13. Jeb's arguments and his witnesses focused on the alleged sexual abuse as well as Edna's housing stability and credibility. Edna sought to refute those allegations while additionally introducing evidence of Jeb's history of perpetrating domestic violence. The superior court recognized that "there is no look-back time on instances of domestic violence," meaning past incidents could be introduced regardless of how long ago they occurred. But rather than permit Edna's counsel to question Jeb about those instances, the court asked which specific past incidents of domestic violence Edna wanted to introduce evidence on. The parties were then ordered to submit written closing arguments to explain the legal reasons why the court should or should not look

___

[3]     *See* AS 25.24.150(g).

at those incidents. Edna also testified about several instances of more recent domestic violence, including two incidents prior to the 2017 custody agreement, as well as Jeb's recent refusal to return G.S. to Edna for a month and the "ransom" and "tug-of-war" episodes. When her counsel then attempted to question Edna's mother to confirm that allegations of domestic violence were "not a recent fabrication," the court sustained Jeb's objection for hearsay. Aside from domestic violence, Edna testified that G.S. told her he was "afraid" and that he "didn't want to go back to his dad" because Jeb "spanks him all the time." She also testified that G.S. said Jeb's older son "would be abusive to him" and had "hit him in the face . . . [and] broke his toys."

The superior court issued findings denying both parties' motions to modify custody on December 17, 2018. The court relied on the parties' supplemental briefing that discussed whether any authority "authorize[d] consideration of acts of domestic violence alleged to have occurred prior to the entry of a stipulated custody decree in a subsequent modification hearing." Although Edna identified two cases that "suggest[] the court may be required to consider such evidence," the court held those cases "inapposite" because "domestic violence issues have informed [this] case and decisions throughout its entire history." The court then noted that both parties were represented from the first hearing on and that Edna's counsel represented in 2015 that "domestic violence . . . in *either* parent['s] household" was not a concern. (Emphasis in original.) The court noted that the custody investigator's report "documented the various DV issues for both parties" and "specifically addressed" many of the incidents Edna raised at the hearing. Because the stipulated agreement was "essentially a shared custody schedule consistent with [Jeb]'s work schedule," the court reasoned that Edna "clearly agreed with the [custody investigator's report]." But the court ultimately refused to consider Edna's domestic violence arguments:

In the present case, the parties reached their custody agreement fully informed on all issues and with the help of counsel. The issue of domestic violence was fully disclosed by the [custody investigator's] report and certainly "adequately addressed" by the order requested by represented parties and accepted by the court. In this posture of full disclosure to represented parties, and the ability to litigate these issues prior to entering in the now controlling Decree, the court finds [Edna] cannot now attempt to use issues which she knowingly, voluntarily, and intelligently abandoned in her decision for an agreed upon resolution. . . . [T]he court finds that acts of domestic violence now raised by [Edna] are barred and estopped from being raised at this junction, and the request to make such findings denied.

Having disposed of the domestic violence allegations, the court then found that Jeb had "failed to prove by a preponderance of the evidence that [G.S.] was sexually abused . . . or that [Edna] cannot keep him safe." Jeb also "failed to prove . . . that household moves by [Edna] constitute instability such as to adversely impact [G.S.]." The court noted — incorrectly — that Edna "contends no substantial change of circumstances exist" and made no mention of her other claims of recent domestic violence. The court's final ruling was that "neither party has established a substantial change of circumstance" because "the parties were [sic] contested most terms of custody in the past. They continue to do so now." The court denied Edna's motion to reconsider, and she now appeals.

## III. STANDARD OF REVIEW

In the child custody context, we will reverse a decision "only if findings of fact are clearly erroneous or if the superior court abused its discretion."[4] The superior court's decision to apply collateral estoppel is likewise reviewed for abuse of discretion

---

[4] *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)), *reh'g denied* (Oct. 31, 2018).

"when its technical requirements are otherwise satisfied."[5] On the other hand, "[w]hether the superior court applied the correct legal standard is a question of law that we review de novo."[6] This includes "[t]he applicability of collateral estoppel to a particular set of facts."[7]

## IV. DISCUSSION

Edna argues that the superior court incorrectly applied the doctrine of collateral estoppel to the issue of domestic violence because the court "never had an opportunity to adjudicate it" in the first place. The superior court based its decision largely on the custody investigator's report rather than any prior judicial findings of fact regarding domestic violence. We agree that the superior court committed legal error in applying collateral estoppel to the situation at hand.

Allegations of domestic violence are not to be taken lightly in the child custody context. Alaska Statute 25.20.110(a) provides that "[a]n award of custody of a child . . . may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child." That same statute states that a recent occurrence of domestic violence is itself a per se finding of changed circumstances.[8] Alaska Statute 25.24.150(g) further provides "a rebuttable presumption that a parent who has a history of perpetrating domestic violence

---

[5]     *Andrea C. v. Marcus K.*, 355 P.3d 521, 526 (Alaska 2015) (footnote omitted).

[6]     *Rego v. Rego*, 259 P.3d 447, 452 (Alaska 2011).

[7]     *Andrea C.*, 355 P.3d at 526 (quoting *State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995)).

[8]     AS 25.20.110(c) ("[A] finding that a crime involving domestic violence has occurred since the last custody or visitation determination is a finding of change of circumstances . . . ."); *accord Hanson v. Hanson*, 36 P.3d 1181, 1187 (Alaska 2001).

against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child." One of the best interests factors that courts must consider likewise concerns the presence of "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents."[9]

In *Williams v. Barbee* we held "that where a superior court finds that domestic violence occurred, it must make express findings regarding whether the incident or incidents of domestic violence constitute a 'history of perpetrating domestic violence.' "[10] Failing to make those findings is "plain error."[11] Apropos to the case now before us, we further noted that such findings are "especially necessary" in situations "where the presumption was not addressed at the initial custody determination because the custody award was made pursuant to an agreement of the parties."[12] Such stipulated custody agreements do not constitute "findings of fact" and are not entitled to deference.[13] Further acknowledging the legislature's important statutory goal of protecting children from the long-term effects of domestic violence,[14] we have repeatedly emphasized that these commands apply equally to any alleged acts, whether arising

---

[9] AS 25.24.150(c)(7).

[10] 243 P.3d 995, 1004 (Alaska 2010) (quoting AS 25.24.150(h)).

[11] *Id.* (quoting *Michele M. v. Richard R.*, 177 P.3d 830, 837 (Alaska 2008)).

[12] *Id.* at 1003.

[13] *Id.* at 1003 n.34 (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1115 (Alaska 2002)); *accord Heber v. Heber*, 330 P.3d 926, 932 (Alaska 2014) (noting that to effectuate child's best interests, courts "must disregard [any contrary] stipulation in the dissolution petition even if that result is unfair to one of the parents").

[14] *See Williams*, 243 P.3d at 1001-02 & nn.25-27 (discussing legislative history behind domestic violence provisions in AS 25.24.150).

before or after the initial custody agreement.[15] In other words, where there is smoke, the superior court is obligated to proactively search out any potential fires.

We addressed the application of collateral estoppel to child custody decisions in *McAlpine v. Pacarro*.[16] There we held that "res judicata does not apply to custody modification motions, although the principle of finality does."[17] While "parties should not be allowed to relitigate 'in the hope of gaining a more favorable position,' "[18] we recognized that the rules are "relaxed . . . in custody matters involving domestic violence," and the superior court must "look back to events that occurred before the initial custody order if not *adequately addressed* at the initial custody determination or subsequent proceedings."[19] Nonetheless, we noted that certain issues could be barred by the doctrine of collateral estoppel, or issue preclusion, when: "(1) the party against whom preclusion is sought was a party . . . to the first action; (2) the issue is identical to the issue previously decided; (3) a final judgment on the merits was issued; and (4) the

---

[15] *Id.* at 997, 1007 (remanding for superior court to make express findings on alleged acts of domestic violence occurring more than a year before initial custody agreement); *see also Heber*, 330 P.3d at 932; *McAlpine v. Pacarro*, 262 P.3d 622, 626 (Alaska 2011).

[16] 262 P.3d at 625-27.

[17] *Id.* at 626. There are three elements in res judicata, otherwise known as claim preclusion: "(1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in a dispute between the same parties . . . about the same cause of action." *Id.* at 625 (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010)).

[18] *Id.* at 626 (unnoted alteration in original) (quoting *Bunn v. House*, 934 P.2d 753, 758 (Alaska 1997)).

[19] *Id.* (emphasis added).

determination of the issue was essential to the final judgment."[20] Even then, this principle is to be employed sparingly — it requires careful discretion "tempered by principles of fairness in light of the circumstances of each particular case,"[21] and therefore may not be warranted if the parties were not previously provided an opportunity to "fully and fairly contest[] the issue."[22] We thus concluded that those "domestic violence allegations that were *actually raised*" in previous hearings may be subject to preclusion, and we remanded for the superior court to consider "the fairness of applying collateral estoppel."[23]

In subsequent cases we have attempted to further clarify when collateral estoppel may be available in the context of domestic violence allegations in custody proceedings. In *Heather W. v. Rudy R.* we held that collateral estoppel was improper when there was no indication that any evidence of "domestic violence ha[d] ever been *heard* in a custody proceeding."[24] That case was remanded specifically "because the issue of domestic violence ha[d] never been *adjudicated*."[25] We also noted that, although the mother in *McAlpine* did not have counsel, "this does not mean that the rule from *McAlpine* applies only when one or both parties are pro se."[26] In another case, we upheld

---

[20] *Id.* at 627 (citing *Latham v. Palin*, 251 P.3d 341, 344 (Alaska 2011)).

[21] *Id.* (quoting *Misyura v. Misyura*, 242 P.3d 1037, 1040 (Alaska 2010)).

[22] *Id.*

[23] *Id.* (emphasis added).

[24] 274 P.3d 478, 486 (Alaska 2012) (emphasis added).

[25] *Id.* at 480 (emphasis added).

[26] *Id.* at 486 n.30.

the superior court's refusal to apply collateral estoppel to a protective order due in part to the fact that the order contained only "cursory findings."[27]

Although we have employed different language over the years to describe the level of inquiry necessary for the application of collateral estoppel, the actual requirements have never changed. As for the finality requirement, we have stated that "the test is whether the issue has been 'fully litigated.' "[28] In other words, unless some court oversaw "a full and vigorous contest of the issue,"[29] collateral estoppel is improper.

The superior court here noted correctly that "there is no look-back time on instances of domestic violence," but it subsequently found that domestic violence had been "fully disclosed" in the custody investigator's report and "adequately addressed" in the initial custody agreement, which was "requested by represented parties and accepted by the court." And even though the court had never explicitly made any findings of fact on domestic violence, it reasoned that "domestic violence issues have informed the case and decisions throughout its entire history." This misstated the correct legal standard. First, although the court pointed out numerous times that Edna was represented by counsel, *Heather W.* plainly states that whether parties are represented is

---

**27** *Harris v. Governale*, 311 P.3d 1052, 1057 (Alaska 2013); *see also Andrea C. v. Marcus K.*, 355 P.3d 521, 527-28 (Alaska 2015) (holding that superior court did not abuse its discretion by declining to apply collateral estoppel where father believed separate protective order would have "no impact" on his custody case).

**28** *Borg-Warner Corp. v. Avco Corp. (Lycoming Div.)*, 850 P.2d 628, 635 (Alaska 1993).

**29** *McAlpine v. Pacarro*, 262 P.3d 622, 627 (Alaska 2011) (citing *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1250 n.29 (Alaska 2001)); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 28(5) (AM. LAW INST. 1982).

irrelevant.[30] Second, the custody investigator's report is not an adequate substitute for judicial fact-finding — its review of the allegations was cursory, barely spanning half a page, and ultimately the report relied heavily on language from Edna's 2015 motion. While the court believed Edna "clearly agreed with" and had thus adopted the report's statements when the court incorporated the parties' proposed findings of fact into its "controlling" custody decree, the 2017 findings were silent on domestic violence. Regardless, we have repeatedly admonished against deferring to negotiated custody agreements when domestic violence is involved.[31] Finally, the court's finding that prior instances of domestic violence were "fully disclosed" and had "informed the case and decisions throughout" is not a finding that the issue has been "adequately addressed," much less "fully litigated" as our case law requires.[32] Because no court ever made findings of fact in regard to Edna's domestic violence allegations, it was error for the

---

[30]     274 P.3d at 486 n.30.

[31]     *See Heber v. Heber*, 330 P.3d 926, 932 (Alaska 2014); *Williams v. Barbee*, 243 P.3d 995, 1002-03 (Alaska 2010).

[32]     Paradoxically, the superior court found that Edna "knowingly, voluntarily, and intelligently abandoned" those issues by refusing to litigate them earlier. But having never been litigated cannot possibly mean "fully litigated" for the purposes of collateral estoppel. The court appears to have misapplied the test for waiver or equitable estoppel instead of the test for collateral estoppel. *See Carr-Gottstein Foods Co. v. Wasilla, LLC*, 182 P.3d 1131, 1136 (Alaska 2008) ("To prove an implied waiver of a legal right, there must be direct, unequivocal conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver." (quoting *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978))); *cf. Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1016 n.13 (Alaska 2011) (noting that "collateral estoppel and equitable estoppel are quite distinct doctrines," and raising one does not preserve appeal on the other). Where res judicata is unavailable, *McAlpine*, 262 P.3d at 626, Jeb cannot avail himself of arguments under a theory of waiver or equitable estoppel to reach the same result.

superior court to apply collateral estoppel to bar her from submitting evidence on that issue. We reverse the court's decision to apply collateral estoppel, vacate its findings on no change of circumstances, and remand for an evidentiary hearing on the domestic violence allegations regarding alleged incidents before and after the parties' stipulated custody agreement.

We note also that the court never actually discussed Edna's arguments for changed circumstances due to *recent* acts of domestic violence, including Jeb's alleged custodial interference.[33] These allegations also must be addressed on remand.

## V. CONCLUSION

We REVERSE the superior court's decision to apply collateral estoppel, VACATE its determination on changed circumstances, and REMAND the case for further proceedings.[34]

---

[33] Custodial interference in the second degree occurs when a minor child's relative "keeps that child . . . from a lawful custodian with intent to hold the child . . . for a protracted period" when that relative knows they have "no legal right to do so." AS 11.41.330(a)(1); *see also* AS 18.66.990(3)(A) (defining "domestic violence" to include custodial interference); *Regina C. v. Michael C.*, 440 P.3d 199, 206-07 (Alaska 2019) (acknowledging that custodial interference is relevant to determining history of domestic violence).

[34] Edna also moved for attorney's fees incurred as a result of Jeb's motion to modify. Although the court had not resolved this motion as of Edna's appeal, any award or denial of attorney's fees is also VACATED.