*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective Proceedings of | ) ) ) | Supreme Court No. S-17756 |
| NORA D. | ) ) ) ) ) ) ) | Superior Court No. ▮▮▮▮▮▮▮▮▮▮ O P I N I O N No. 7526 – May 7, 2021 |

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Julie L. Webb, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Nora D. Bruce F. Stanford and Megan Rowe (limited appearance for oral argument), Law Offices of Bruce F. Stanford, LLC, Seward, for Kevin G. Chad Hansen and Mark Regan, Disability Law Center of Alaska, Anchorage, for Amicus Curiae Disability Law Center of Alaska. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Amicus Curiae State of Alaska, Department of Health and Social Services, Adult Protective Services.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

WINFREE, Justice.

## I.    INTRODUCTION

The superior court ordered a respondent in a guardianship matter to attend a psychiatric evaluation and answer all questions posed to her by a petitioner's retained expert.  But a guardianship statute provides that a respondent may refuse to answer questions during examinations and evaluations.  The only exception to that statute applies in an interview to determine whether the respondent has capacity to make informed decisions about care and treatment services.  We granted the respondent's petition for review to consider the scope of the statute's protection, and we conclude that a respondent may refuse to answer any questions other than those directed at determining the respondent's capacity to make personal medical decisions.  We therefore vacate the superior court's order and remand for proceedings consistent with this opinion.

## II.    FACTS AND PROCEEDINGS

Nora D. is an 82-year-old woman residing in an assisted living facility.[1] Nora suffered a stroke in April 2016, and she reportedly continues to suffer resulting physical and mental limitations.  In 2017 Nora gave her son, Cliff, a general power of attorney.  In 2018 Adult Protective Services petitioned for a conservatorship[2] to protect Nora's finances and property after the office received reports of harm alleging that Cliff had made decisions not in Nora's best interests.  The Office of Public Advocacy (OPA) was appointed as Nora's conservator in 2018.

In September 2019 Nora's daughter, Naomi, petitioned for a full guardianship for Nora.  Naomi alleged that a guardianship was necessary because Nora

---

[1]    We use pseudonyms to protect the privacy of those involved.

[2]    A court may appoint a conservator to manage the property or financial affairs of an adult who is unable to do so because of "mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, fraud, confinement, detention by a foreign power, or disappearance."  AS 13.26.401(2).

was unable to attend to her own physical needs and Cliff was unable to care for Nora. A day later Naomi's son, Kevin, petitioned for review of the conservatorship and sought appointment as Nora's guardian, which could replace OPA's conservatorship.[3]

In January 2020 the superior court held a hearing about the petitions. Acknowledging that Nora's capacity was "a central issue in the case," the court discussed the possibility of a mental examination. In February Kevin sought a mental examination by his retained expert.[4] Nora opposed the motion, arguing that a mental

---

[3]     *See* AS 13.26.316(c)(6) (providing that, in addition to other rights and powers, full guardian has powers and duties of conservator). *But see* AS 13.26.316(c)(7) (acknowledging that conservator and full guardian need not be same person).

[4]     Alaska Civil Rule 35(a) provides:

> When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

In a guardianship proceeding the superior court is required to appoint a person known as a "visitor" to arrange evaluations and submit a report; the court also must appoint its own expert. *See* AS 13.26.226(c) (providing as part of initial guardianship procedures that "court *shall* appoint a visitor" who interviews respondent and proposed guardian, arranges evaluations, and files written report and that "court *shall* also appoint an expert who has expertise in regard to the alleged or admitted incapacity to investigate the issue of incapacity." (emphases added)); *see also* AS 13.26.291(a) ("[T]he state *shall* bear the costs of the visitor and expert appointed under AS 13.26.226(c)." (emphasis added)). In this case the court appointed OPA as its expert. The court visitor explained at a hearing that OPA usually finds and appoints an expert but that it had not done so in this case.

examination was not necessary because existing evidence was sufficient to determine her capacity. Nora also argued that she had a right to remain silent at the mental examination.

The superior court granted Kevin's motion and ordered the mental examination. The court permitted Nora's attorney and an expert of her choice to be present at the examination, but it expressly stated that Nora's attorney and expert were not to interfere with the examination. The court stated that any party who interfered with the examination would be subject to sanctions, and it expressly prohibited Nora from remaining silent during the examination. Nora moved for reconsideration, which the court denied.

Nora petitioned for review, which we granted. We requested briefing from the parties and two amici curiae, the Alaska Department of Health and Social Services (DHSS) and the Disability Law Center of Alaska. We thank the amici for their helpful participation in this matter.

## III. STANDARD OF REVIEW

Statutory interpretation is a question of law that we review de novo.[5]

---

[5] *Rosauer v. Manos*, 440 P.3d 145, 147 (Alaska 2019). Although we review the superior court's decision to order an examination under Rule 35(a) for abuse of discretion, *Alyssa B. v. State, Dep't of Health & Soc. Servs.*, 123 P.3d 646, 648 (Alaska 2005), Nora does not challenge the court's decision to require the examination; rather she asserts that certain provisions of the order are contrary to law.

## IV.  DISCUSSION

### A.  Guardianship History And Policy

#### 1.  Guardianship history

In early 1980 a bill was introduced to comprehensively reform Alaska's guardianship laws.[6]  The bill did not make it out of committee,[7] but a similar bill, Senate Bill (S.B.) 3, was passed in 1981.[8]  S.B. 3's passage coincided with nationwide efforts to reform guardianship statutes.[9]  Reform advocates emphasized that guardianships were a massive government intrusion into individuals' lives.[10]  Reform efforts focused on, among other things, enhancing due process protections for individuals allegedly in need of guardianships, increasing the use of partial or limited guardianships as opposed to plenary guardianships, and increasing scrutiny for incapacity determinations.[11]

S.B. 3 aligned with these objectives.  Alaska's guardianship statutes before the 1981 amendments did not contemplate the possibility of a partial guardianship.[12]  By contrast, S.B. 3 provided that guardianships "shall be used only as is necessary to

---

[6]  House Bill (H.B.) 572, 11th Leg., 2d Sess. (1980).

[7]  *See* H.B. 572 History of Legislation, 11th Leg., 2d Sess. (July 17, 1980) (showing bill was referred to committees in Senate with no further action taken).

[8]  *Compare* H.B. 572, *with* S.B. 3, 12th Leg., 1st Sess. (Jan. 13, 1981).

[9]  *See* U.S. SENATE SPECIAL COMM. ON AGING, 115TH CONG., ENSURING TRUST: STRENGTHENING STATE EFFORTS TO OVERHAUL THE GUARDIANSHIP PROCESS AND PROTECT OLDER AMERICANS 10-11 (2018).

[10]  Lawrence A. Frolik, *Promoting Judicial Acceptance And Use of Limited Guardianship*, 31 STETSON L. REV. 735, 739 (2002).

[11]  U.S. SENATE SPECIAL COMM. ON AGING, *supra* note 9, at 10-11.

[12]  *See* former AS 13.26.110 (1980).

promote and protect the well-being of the person, shall be designed to encourage the development of maximum self-reliance and independence of the person, and shall be ordered only to the extent necessitated by the person's actual mental and physical limitations."[13] Supporters of the bill applauded the creation of and emphasis on using limited guardianships.[14] S.B. 3 also increased due process protections by creating a more precise process for imposing a guardianship[15] and requiring courts to create specific

---

[13]     Ch. 83, § 4, SLA 1981.

[14]     *See, e.g.*, Minutes, Sen. Fin. Comm., Hearing on S.B. 3, 12th Leg., 1st Sess. 684 (May 20, 1981) (statement of Sen. Charles Parr) (noting one major emphasis of legislation was that "guardianship[s] do[] not need to be 100%"); Position Paper on S.B. 3 from Governor's Council for the Handicapped & Gifted (Feb. 1981) (noting council supported bill because, among other things, "S.B. 3 provides for partial or limited guardianship as well as full or plenary guardianship so that an individual's rights are modified only in those areas of incapacity") (available in Sen. Judiciary Comm. bill file); Position Paper on S.B. 3 from Dep't of Health & Soc. Servs. (June 4, 1981) (noting DHSS supported bill because, among other things, bill "provides for partial guardianship orders when the ward does not need a total guardianship") (available in H. Judiciary Comm. bill file).

[15]     *Compare* former AS 13.26.105-.110 (1980), *with* ch. 83, §§ 6-7, SLA 1981; *see also* Position Paper from Governor's Council for the Handicapped & Gifted, *supra* note 14, at 4-5 (noting that before passage of S.B. 3, changes were needed to improve due process protections under guardianship statutes) (available in Sen. Judiciary Comm. bill file); Hearing on S.B. 3 Before the Sen. Judiciary Comm., 12th Leg., 1st Sess. 4 (Mar. 18, 1981) (testimony of John Nuttall, Governor's Council for the Handicapped & Gifted) (noting council supported bill because "it provide[d] clear procedures for guardianship proceedings" and included time limits on petitions for appointment of guardians) (available in Sen. Judiciary Comm. bill file); Letter from Paul E. Turner, Clinical Psychologist, Cent. Peninsula Mental Health Ctr., to Sen. Patrick M. Rodey, Chairman, Sen. Judiciary Comm. (Mar. 26, 1981) (noting he supported S.B. 3 because "current state statutes are so broad and ambiguous [that] the rights of an individual thought to be incapacitated could be easily violated" and that enhanced court procedures could reduce long wait times) (available in Sen. Judiciary Comm. bill file).

guardianship plans outlining guardians' responsibilities and powers.[16] And the bill made an incapacity determination dependent on ability to provide for a person's own health or safety rather than on a mental diagnosis.[17]

### 2. Guardianship policy

The policy behind the adult guardianship statutes has been explicitly stated by the legislature:

> Guardianship for an incapacitated person shall be used only as is necessary to promote and protect the well-being of the person, shall be designed to encourage the development of maximum self-reliance and independence of the person, and shall be ordered only to the extent necessitated by the person's actual mental and physical limitations. An incapacitated person for whom a guardian has been appointed is not presumed to be incompetent and retains all legal and civil rights except those that have been expressly limited by court order or have been specifically granted to the guardian by the court.[18]

We have described this as a "strong policy of restraint."[19]

### B. Guardianship Process

Any person may petition the superior court to appoint a guardian for another person.[20] The petition must explain, among other things, the "nature and degree" of the respondent's incapacity and the type and duration of guardianship assistance

---

[16] Ch. 83, § 7, SLA 1981.

[17] *Compare* ch. 83, § 1, SLA 1981, *with* former AS 13.26.005(1) (1980).

[18] AS 13.26.201.

[19] *In re O.S.D.*, 672 P.2d 1304, 1306 (Alaska 1983).

[20] AS 13.26.221(a).

sought.[21] After the petition is received, the court appoints a visitor[22] and an expert with expertise in the area of the alleged incapacity.[23] The visitor "interviews" the respondent and the person seeking to be the respondent's guardian, if any, and files a report with the court.[24] The expert "examine[s]" the respondent and files a report with the court.[25] The court then holds a hearing on the incapacity issue;[26] at the hearing the respondent is entitled to present evidence, cross-examine witnesses, and remain silent.[27]

If the court finds by clear and convincing evidence that the respondent is incapacitated, the court must determine "the extent of the incapacity and the feasibility of alternatives to guardianship to meet the needs of the respondent."[28] The court may appoint a full guardian only if it finds "that the respondent is totally without capacity to care for the respondent and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the

---

[21]     AS 13.26.221(b).

[22]     *See* AS 13.26.005(12) (defining "visitor" as "a person trained or experienced in law, medical care, mental health care, pastoral care, education, rehabilitation, or social work, who is an officer, employee, or special appointee of the court with no personal interest in the proceedings").

[23]     AS 13.26.226(c).

[24]     *Id.*; *see also* AS 13.26.236(c) (providing requirements for contents of visitor's report).

[25]     AS 13.26.226(c).

[26]     AS 13.26.226(a).

[27]     AS 13.26.251(a).

[28]     AS 13.26.251(b)-(c).

respondent."[29] The court otherwise must appoint a partial guardian[30] or, if "alternatives to guardianship are feasible and adequate to meet the needs of the respondent, the court may . . . order an alternative form of protection."[31] If the court appoints a full or partial guardian, it must issue a guardianship order detailing the guardian's authority.[32] And within 90 days of the guardianship order's distribution, the guardian must submit a guardianship implementation report describing the "guardian's program for implementing the guardianship plan."[33] The guardian thereafter is required to submit annual reports, and a court visitor must review the guardianship and submit a report every three years.[34]

---

[29] AS 13.26.251(f). A full guardian "has the same powers and duties respecting the ward that a parent has respecting an unemancipated minor child." AS 13.26.316(c).

[30] AS 13.26.251(e) ("If it is found that the respondent is able to perform some, but not all, of the functions necessary to care for the respondent, and alternatives to guardianship are not feasible or adequate to provide for the needs of the respondent, the court may appoint a partial guardian, but may not appoint a full guardian."). A partial guardian is therefore authorized to act on behalf of the ward only to the extent that person is found to be incapacitated. *See id.*; *see also* AS 13.26.005(6) (" '[P]artial guardian' means a guardian who possesses fewer than all of the legal duties and powers of a full guardian, and whose rights, powers, and duties have been specifically enumerated by court order.").

[31] AS 13.26.251(d).

[32] AS 13.26.266.

[33] AS 13.26.271.

[34] AS 13.26.276.

### C. Scope Of Respondent's Right To Refuse To Answer Questions Under AS 13.26.241(a)

#### 1. The statute

The primary issue in this case is the proper interpretation of AS 13.26.241(a), providing:

> A ward or respondent has the right to refuse to respond to questions in the course of examinations and evaluations. However, the ward or respondent may be required to submit to interviews for the purpose of ascertaining whether the ward or respondent lacks the capacity to make informed decisions about care and treatment services.[35]

#### 2. The arguments

Nora contends that AS 13.26.241(a) permits her to remain silent at a court-ordered mental examination. Nora contends that the term "interviews" in AS 13.26.241(a) refers to interactions with the court visitor and her attorney and that the terms "examinations and evaluations" refer to interactions with experts and other professionals. Nora argues that she cannot be compelled to answer questions at the examination because the examination is not an interview.

Kevin spends almost the entirety of his briefing claiming that Nora's publicly appointed attorney is acting unethically and against Nora's best interests. These claims are wholly unsupported by the record before us, which reflects that Nora's attorney has represented Nora in an appropriate and zealous manner.

---

[35] We note that the adult guardianship statutes provide a separate, independent basis for respondents remaining silent: A "respondent at all times has the right to refuse to answer questions if the answers may tend to incriminate the . . . respondent." AS 13.26.241(b). This provision is not directly at issue in this case, because Nora has not argued that the examination may tend to incriminate her.

Amicus Disability Law Center, supporting Nora's position, argues generally that AS 13.26.241(a) should be interpreted to "give maximum protection to a respondent's rights, including the right to refuse to answer questions and not to have that refusal commented upon." Amicus DHSS disputes Nora's interpretation, arguing that "[s]tandard definitions of 'interview' " support the conclusion that a professional or expert may interview a respondent. DHSS argues that the right to remain silent depends on the interview's purpose and that AS 13.26.241(a) requires an individual to answer questions whenever the interview is necessary to determine an individual's "decision-making capacity" and "ability to take care of her own needs." DHSS suggests that respondents could not be compelled to answer questions when other forms of incapacity, such as physical limitations, are at issue or when the interview's purpose is "diagnosing a mental disorder, assessing what services the respondent needs, finding out her preferences, or evaluating her capacity to work, learn job skills, or get further education."

### 3.    Interpretation of the statute

"We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[36] We use a sliding scale approach: "[T]he plainer the language of the statute, the more convincing contrary legislative history must be."[37] "[W]henever possible, [we] interpret each part or section of a statute with every other part or section, so as to create a harmonious whole."[38]

---

[36]    *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[37]    *Id.* (quoting *Alaskans for Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004)).

[38]    *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive*
(continued...)

Although Nora presents interesting arguments about the textual distinction between "interviews" and "examinations and evaluations,"[39] we need not reach that issue. We instead focus our analysis on the meaning of "interviews for the purpose of ascertaining whether the ward or respondent lacks the capacity to make informed decisions about care and treatment services."[40] The guardianship statutes recognize that capacity is not an all or nothing proposition: An individual may lack capacity to manage some aspects of daily life while simultaneously having capacity to manage all other aspects.[41] We therefore hold that it was erroneous to compel Nora to answer all questions at the mental health examination because a guardianship proceeding respondent can be compelled to answer only questions intended to determine the respondent's capacity to make personal medical decisions. This conclusion is supported by the guardianship statutes' text, relevant legislative history, and policy.

The text of AS 13.26.241(a) and other adult guardianship statutes supports concluding that "interviews for the purpose of ascertaining capacity to make informed decisions about care and treatment services" refers to interviews to determine capacity to make personal medical decisions. The term "informed decisions" is not defined by

---

[38]    (...continued)
*Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007) (quoting *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999)).

[39]    *See Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 182 (Alaska 2019) ("Principles of statutory construction mandate that we assume the legislature meant to differentiate between two concepts when it used two different terms.").

[40]    AS 13.26.241(a).

[41]    *See* AS 13.26.251(e) (providing for partial guardianship for persons able to perform some but not all necessary functions); *see also supra* note 14.

the guardianship statutes,[42] but it is textually similar to "informed consent," the long-recognized doctrine requiring a patient's consent before providing any medical treatments or services.[43] The doctrine is based in part on an individual's right to personal autonomy and to make decisions regarding one's own body.[44] And "care and treatment services" suggests resources obtained for one's health.[45]

A similar distinction is evident elsewhere in the adult guardianship statutes. Although a guardian generally "may give consents or approvals necessary to enable the

---

[42] *See* AS 13.26.005 (defining terms used in guardianship statutes).

[43] *See* AS 09.55.556(a) (making "provider . . . liable for failure to obtain the informed consent of a patient if . . . the provider . . . failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure"); AS 47.30.839 (requiring hearing on individual's capacity to give informed consent to medication before evaluation or treatment facility can obtain court approval for administration of psychotropic medication); *see also* 70 C.J.S. *Physicians and Surgeons* § 136 (2021) (describing necessity for informed consent).

[44] *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) ("Th[e] notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."); 70 C.J.S. *Physicians and Surgeons* § 137 (2021).

[45] We previously have acknowledged expert testimony concluding that a respondent lacked the ability to make "informed medical decisions" when reviewing a superior court's determination that an individual was fully incapacitated. *In re W.A.*, 193 P.3d 743, 745, 747 (Alaska 2008) (noting that expert conducted interview and created report "intended to focus on whether [the respondent] 'lacks a capacity to make informed decisions about care and treatment services' " and that another expert concluded respondent had "severe deficits with medical decision-making" that "likely preclud[ed] his ability to make informed medical decisions regarding his treatment").

ward to receive medical or other professional care, counsel, treatment, or services,"[46] a guardian may not take an enumerated list of actions, most relating to the incapacitated person's medical care.[47] This demonstrates that the legislature understood personal medical decisions to involve a heightened risk of erroneous deprivation of liberty warranting additional procedural protections. And a respondent has the right to be free from psychotropic medications' effects during judicial proceedings,[48] suggesting that the legislature understood some medical decisions could greatly affect the ability to participate in important affairs.

More generally, the common law recognizes that important interests of dignity, self-determination, autonomy, and privacy are implicated by an individual's ability to make personal medical decisions.[49] The common law has long recognized the right to be free from unwanted medical touching.[50] The United States Supreme Court has

---

[46] AS 13.26.316(c)(5).

[47] AS 13.26.316(e) (providing that guardian may not, among other things, place respondent in institution or consent on behalf of respondent to removal of organs, abortion, experimental procedures, or withholding lifesaving procedures except in certain circumstances). The remaining expressly prohibited activities relate to fundamental rights, including voting and marriage. *Id.*

[48] AS 13.26.256.

[49] "We presume that the legislature is aware of the common law when enacting statutes," *Young v. Embley*, 143 P.3d 936, 945 (Alaska 2006), and we have stated that "[t]he common law . . . furnishes one of the most reliable backgrounds upon which analysis of the objects and purposes of a statute can be determined," *id.* (quoting NORMAN A. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 50:01, at 139 (6th ed. 2000)).

[50] *See, e.g.*, *Schloendorff v. Soc'y of N.Y. Hosp.* 105 N.E. 92, 93 (N.Y. 1914) *abrogated on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957) ("Every
(continued...)

explained that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[51]

We have recognized that "the right to make decisions about medical treatments for oneself . . . is a fundamental liberty and privacy right" under the Alaska Constitution,[52] and the United States Supreme Court similarly has held that the right to refuse medical treatment is a liberty interest protected by the United States Constitution.[53] Because an important and long-recognized liberty interest is at stake, it makes sense that the legislature would seek to provide the court additional evidence about a respondent's ability to make personal medical decisions (by requiring the respondent to answer questions) to better protect against the risk of an erroneous deprivation. This exception to the respondent's right to refuse to answer questions ensures that a court has ample evidence before determining whether a guardian is permitted to make sensitive and personal decisions affecting the respondent's bodily autonomy, dignity, and privacy.

---

[50]     (...continued) human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."); *see also Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) ("At common law, even the touching of one person by another without consent and without legal justification was a battery.").

[51]     *Cruzan*, 497 U.S. at 269 (quoting *Union Pac. R.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[52]     *Huffman v. State*, 204 P.3d 339, 346 (Alaska 2009).

[53]     *Cruzan*, 497 U.S. at 278. *But see id.* at 279 (noting that interest is not absolute and must be balanced against relevant state interests).

This interpretation also is supported by the relevant guardianship legislative history, showing that the legislature understood S.B. 3 would increase due process protections for, and more thoroughly protect the rights of, allegedly incapacitated persons. A narrow interpretation of AS 13.26.241(a)'s second sentence, preserving the right to refuse to answer questions (and therefore protect one's privacy) when other forms of incapacity are at issue, is consistent with the legislature's intent. The legislature also sought to increase the use of limited or partial guardianships, such that guardians were authorized only to the extent of the incapacitation. This is consistent with an interpretation of the statute recognizing an individual can be incapacitated in one respect and competent in another. The conclusion that "incapacity to make informed decisions about care and treatment services" refers to one's inability to make personal medical decisions therefore is supported by the guardianship legislative history.

Finally, this interpretation also is supported by the "strong policy of restraint" behind the adult guardianship statutes.[54] A narrow reading of the exception to the right to refuse to answer questions may make it more difficult to find, by clear and convincing evidence,[55] that a guardian is warranted, but it is consistent with the legislature's determination that guardianships should be imposed only when and to the extent the necessity for one is clearly shown.

DHSS seems to agree that the right to remain silent in a guardianship proceeding examination depends on the examination's purpose. DHSS argues for a broad interpretation, contending that a respondent may be required to participate in an examination for the purpose of ascertaining general capacity. DHSS argues that the right

---

[54] *In re O.S.D.*, 672 P.2d 1304, 1306 (Alaska 1983).

[55] AS 13.26.251(b) (requiring incapacity be proved by clear and convincing evidence); *In re O.S.D.*, 672 P.2d at 1306 (holding clear and convincing evidence standard applies to any determination that may lead to imposition of guardianship).

to remain silent would apply only when incapacity based on physical limitations is at issue. But even assuming DHSS is correct that a person could be found incapacitated based on physical limitations,[56] it is not clear that physical limitations "are more easily assessed without [a respondent's] input if she declines to answer questions during those evaluations or examinations" as DHSS argues.

DHSS also argues that the right to refuse to answer questions applies only to interviews for purposes other than determining decision-making ability, but there is no meaningful distinction to be drawn between interviews to determine decision-making capacity and interviews for other purposes in a guardianship setting. A respondent's mental limitations and their effect on the respondent's ability to make decisions likely would be relevant to questions designed to "diagnos[e] a mental disorder, assess[] what services the respondent needs, . . . or evaluat[e] her capacity to work, learn job skills, or get further education." The only purpose suggested by DHSS that does not obviously invite inquiry into a respondent's mental limitations is determining the individual's preferences. Interpreting a "right to refuse to respond to questions in the course of examinations and evaluations" to mean a respondent has the right to remain silent only during questions designed to determine preferences would allow the exception in AS 13.26.241(a)'s second sentence to swallow the right created in the first sentence. And the limited legislative history offered by DHSS specific to AS 13.26.241(a) does not clearly support DHSS's interpretation.[57]

---

[56] AS 13.26.005(5) (" '[I]ncapacitated person' means a person whose ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the person lacks the ability to provide the essential requirements for . . . physical health or safety without court-ordered assistance . . . .").

[57] *But see* Memorandum from Bernie M. Tuggle, Legislative Legal Extern, to Sen. Patrick M. Rodey, Chairman, Sen. Judiciary Comm. 2 (Feb. 25, 1981) ("[A]
(continued...)

We hold that a respondent can be compelled to answer questions designed to determine the respondent's capacity to make personal medical decisions. In this case, the parties suggested at oral argument that Nora's evaluation would be a psychiatric examination. Based on the parties' description of the examination, it seems unlikely that the examination is intended to determine Nora's capacity to make personal medical decisions. Nora therefore may refuse to answer questions at the examination consistent with this opinion, and her attorney may advise her of this right at the examination.[58]

## V. CONCLUSION

We VACATE the superior court's order and REMAND for further proceedings consistent with this opinion.

---

[57]    (...continued)
respondent has the right to refuse to answer questions during an evaluation, [but] he may be required to give answers to determine whether he lacks capacity."). Although we have relied on or acknowledged a variety of forms of legislative history when discerning legislative intent, we "have indicated that one of the most important considerations is reliability." *Cora G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 461 P.3d 1265, 1281 (Alaska 2020). Because the extern's memorandum contained only cursory analysis, we do not consider it a reliable indicator of the legislature's intent.

[58]    AS 13.26.241(c) ("During an interview or testing conducted under AS 13.26.201-13.26.316, a ward or respondent has the right to be accompanied by an attorney or expert of the ward's or respondent's own choosing.").