*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Protective Proceedings of | ) )   Supreme Court No. S-18672 |
| | ) |
| SASHA J. | )   Superior Court No. 4BE-22-00069PR |
| | ) |
| | )   O P I N I O N |
| | ) |
| | )   No. 7744 – February 7, 2025 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Nathaniel Peters, Judge.

Appearances: Elizabeth D. Friedman, Law Office of Elizabeth D. Friedman, Prineville, Oregon, for Sasha J. Dylan J. Krueger, Assistant Attorney General, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska. Larissa Hail, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Public Guardian.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

HENDERSON, Justice.

## I.    INTRODUCTION

When a person lacks capacity to make certain decisions and to provide for their own care, the superior court may appoint a guardian to fulfill that role. But the court must first find by clear and convincing evidence that the person is incapacitated.

Here, a grandmother petitioned for guardianship of her adult granddaughter. The superior court found by clear and convincing evidence that the granddaughter was incapacitated, and in 2012 it appointed the grandmother as her guardian. The court terminated the guardianship in 2014, however, after the grandmother failed to submit a required guardianship report. From that time until 2022, the grandmother and the granddaughter's sister served as informal care providers.

In 2022 Adult Protective Services (APS) and medical providers raised concerns about the care being provided to the granddaughter, and APS filed a new petition for guardianship. The granddaughter sought a jury trial on the issue of her capacity. APS argued that the granddaughter's incapacity had already been adjudicated in 2012, and that the doctrine of issue preclusion prevented the granddaughter from relitigating the issue. The superior court agreed with APS and granted APS's petition without a new finding that the granddaughter was incapacitated.

The granddaughter appeals the denial of her request for a jury trial on the issue of her capacity. We agree with the granddaughter and reverse the denial of her request for a jury trial on that issue.

## II.    FACTS AND PROCEEDINGS

### A.    2011-2014 Guardianship Proceedings

#### 1.    Initial appointment of Bella as guardian and conservator

In November 2011 Bella J. petitioned for appointment of a full guardian for her nearly-18-year-old granddaughter, Sasha J.,[1] under AS 13.26.150(c). Sasha lived with Bella in a village in Southwest Alaska at the time. In her petition Bella reported that Sasha had developmental disabilities, congenital disorders, challenges with mobility, a heart condition, vision problems, and incontinence. In support of her allegations of incapacity, Bella referred to a physician's opinion that Sasha's "condition constitute[d] a substantial disability to [her] ability to function in society" given her

---

[1]    We use pseudonyms for all family members.

medical history of "seizures, heart murmur, punctured ear drum, fevers [and] earaches, [and] cord around neck at birth."[2]  In response to Bella's guardianship petition, the superior court appointed counsel[3] and a court visitor[4] for Sasha, though it did not appoint an expert as required by statute.[5]  Sasha's counsel informed the court that she was acting as Sasha's guardian ad litem (GAL) in light of Sasha's inability to communicate her position.

In April 2012 the court visitor issued a report recommending that the court appoint Bella as Sasha's full guardian.  The court visitor listed Sasha's diagnoses as including an intellectual disability and seizure disorder.  She reported Sasha could walk to school, dress, and feed herself, and that she had a one-on-one full-time aide at school.

Later in April the superior court held a guardianship hearing.[6]  Sasha's GAL advised that Sasha needed a guardian and recommended that Bella serve as the guardian because she was "doing a great job raising [Sasha]."

The court thereafter appointed Bella as Sasha's full guardian with powers of conservator.[7]  After reviewing the petition and the visitor's report, the court found

---

**2**    Bella referenced these diagnoses and assessments in her petition, but the record does not indicate whether she provided the relevant records to the court.

**3**    AS 13.26.226(b).

**4**    The guardianship statutes require the court to appoint a court visitor. AS 13.26.226(c).  The court visitor "arrange[s] for evaluations to be performed and prepare[s] a written report to be filed with the court" after investigating the need for a guardianship.  *Id.*

**5**    *Id.* ("The court shall also appoint an expert who has expertise in regard to the alleged or admitted incapacity to investigate the issue of incapacity.").

**6**    *See* AS 13.26.251.

**7**    *See* AS 13.26.251(f) (court may only appoint full guardian if court determines that "that the respondent is totally without capacity to care for the respondent and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent").

by clear and convincing evidence that Sasha was incapacitated under AS 13.26.005.[8] It did not check the box on the petition form indicating that Sasha "stipulate[d] to incapacity." The court determined that Sasha was totally without capacity to care for herself regarding medical care, mental health treatment, housing, personal care, application for insurance or benefits, physical and mental examinations, and her income and assets. The court concluded that Bella was suitable to act as Sasha's guardian and conservator.

## 2. Termination of guardianship and conservatorship

About two and a half years later, in October 2014, the court held another guardianship hearing. The court observed that Bella had missed two scheduled meetings and failed to file her annual guardianship report in spite of multiple notices.[9] It issued an order on record terminating Bella's guardianship for these reasons. The court also issued a written order terminating Sasha's guardianship and conservatorship and closing the case. But contrary to the explanation given on record, the court explained its order by noting that it "ha[d] been notified of the adoption of" Sasha by Bella.

## B. 2020-2023 Guardianship Proceedings

### 1. Initial provider and APS concerns about Sasha's care

In 2020, Sasha's treatment providers began noting concerns about whether Sasha was receiving medication prescribed to treat her seizure disorder. A physician assistant (PA) who saw Sasha as a patient several times tested her levels of anti-seizure

---

[8] *See* AS 13.26.005(5) (defining "incapacitated person" as "a person whose ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance").

[9] *See* AS 13.26.276(a) ("A guardian shall submit a report to the court at least annually.").

medication and found her levels were low during some periods. In September 2021 Sasha was also treated at the emergency room in Bethel because she was having frequent seizures, and her doctor there suspected that she was not being given her seizure medications because her prescription had last been picked up in March. Sasha generally received prescriptions for 90-day quantities of medication to be taken twice a day.

Then, in early 2022, APS received information that Sasha was having seizures lasting 30 minutes every day, and that her providers suspected medication noncompliance might be the cause. APS considered this especially concerning given the heightened risk of brain damage and death. A blood test revealed Sasha's medication levels were very low.

### 2. APS guardianship petition and litigation

In light of mounting concerns about Sasha's care, APS filed an emergency petition for appointment of a temporary guardian and a petition for full guardianship in April 2022. APS reported that Sasha was diagnosed with a severe form of epilepsy and that she was non-verbal, requiring lifetime support. It detailed its concerns about seizures and medication noncompliance based on provider reports. APS explained that Sasha was "profoundly disabled and cognitively impaired," and that a school psychological report from when Sasha was 14 "indicate[d] that she had the communication skills of a 19-20[-]month[-]old infant." APS nominated the Office of Public Advocacy (OPA) to serve as Sasha's full guardian because Sasha's "only known family have all lived in the same home as her and acted as caregivers with very poor performance in meeting her . . . needs."

Later the same month a court visitor investigated Sasha's case and wrote a report. She interviewed Sasha's case manager, a health aide from the health clinic, a health clinic staffer, contacts at the tribal office in her village, contacts at the hospital where she was treated, and her sisters Alexandra and Skyler. The court visitor explained that Sasha communicated with sign language and two-word sentences and

had difficulty communicating her basic needs and wants. She recommended appointing OPA as temporary guardian, and suggested that Sasha would benefit from an updated "health, cognitive, and functioning assessment" before the long-term guardianship hearing because Sasha's last cognitive testing was done in 2002.

The superior court held a temporary guardianship hearing in May 2022. Sasha contested[10] the appointment of a public guardian on a temporary emergency basis, arguing that she had "been in this status for many years" and that a review of the record did not demonstrate an emergency. She also expressed concern that the public guardian might remove her from her home and put her in assisted living or administer different medications. Sasha requested that the court hold a full contested hearing and assess options within her family to serve as guardian. The court did so, and heard from Sasha's doctor, her PA, the court visitor, and Sasha's sister Skyler. After hearing the evidence, the court issued an order appointing OPA as Sasha's temporary guardian.

At a status hearing after the temporary guardianship hearing, Sasha requested a jury trial on the question of her capacity. APS responded that the incapacity findings from the 2012 guardianship order were still valid and that Sasha remained "nonverbal and very incapacitated by her various illnesses." The public guardian disagreed, indicating that because Sasha's guardianship had been terminated, APS likely needed to prove Sasha's incapacity again. The court ordered APS to file briefing regarding its position on litigation of the incapacity issue.

---

[10]     Sasha's attorney's role was again converted to that of her GAL, given Sasha's limited ability to communicate her decisions and positions regarding her preferences. *See* AS 13.26.041(c). When we refer to arguments Sasha made before the superior court, we mean arguments expressed by her GAL.

APS filed a motion to apply issue preclusion[11] to the issue of Sasha's incapacity. APS contended the 2012 incapacity findings should be applied here because there was no evidence that Sasha's capacity had changed since 2012. Sasha reiterated her request for a jury trial regarding her capacity and contended that the elements required to apply issue preclusion had not been met. The court issued an order granting APS's motion, finding that all the requirements for issue preclusion had been met and that Sasha therefore had no right to a jury trial on the issue of capacity.

After further motion practice and a hearing, the court appointed the public guardian as Sasha's permanent full guardian with powers of conservator. The court found Sasha was totally without capacity to care for herself and that Sasha had previously agreed to the finding of incapacity. It determined the public guardian was suitable to serve as both guardian and conservator and noted that while the public guardian did not have priority for appointment,[12] her appointment was in Sasha's best interests because no family member was willing, able, and qualified to serve as her guardian and conservator.

Sasha appeals, claiming it was error to apply issue preclusion to the question of her capacity.[13]

---

[11]     Issue preclusion, also known as collateral estoppel, prohibits the relitigation of issues already decided in prior proceedings. *Sykes v. Lawless*, 474 P.3d 636, 643 (Alaska 2020).

[12]     *See* AS 13.26.311(d) (priorities for guardianships); AS 13.26.465(d) (priorities for conservatorships).

[13]     Sasha also contends that the superior court's appointment of the public guardian as her full guardian violated her right to familial association. Because we reverse the superior court's application of issue preclusion to the issue of capacity, we do not reach Sasha's arguments regarding familial association.

## III. STANDARD OF REVIEW

"Questions of . . . collateral estoppel are questions of law that we review de novo."[14] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[15] If the technical elements of collateral estoppel are met, "[t]he superior court's decision to apply collateral estoppel is . . . reviewed for abuse of discretion."[16] "A court abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[17]

## IV. DISCUSSION

### A. Overview Of Guardianship Policy And Process

The legislature has explained the purpose behind the guardianship statutes, including its intent that guardianship may only be ordered where necessary to protect the well-being of a person who is incapacitated:

> Guardianship for an incapacitated person shall be used only as is necessary to promote and protect the well-being of the person, shall be designed to encourage the development of maximum self-reliance and independence of the person, and shall be ordered only to the extent necessitated by the person's actual mental and physical limitations. An incapacitated person for whom a guardian has been appointed is not presumed to be incompetent.[18]

---

**14** *Se. Alaska Conservation Council, Inc. v. State, Dep't of Nat. Res.*, 470 P.3d 129, 136 (Alaska 2020).

**15** *Id.* (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

**16** *Edna K. v. Jeb S.*, 467 P.3d 1046, 1050 (Alaska 2020).

**17** *Wilson v. State, Dep't of Law*, 355 P.3d 549, 555 (Alaska 2015) (quoting *Farmer v. Farmer*, 230 P.3d 689, 693 (Alaska 2010)).

**18** AS 13.26.201.

"We have described this as a 'strong policy of restraint.' "[19]

The guardianship process begins when a person petitions the court to appoint a guardian for another person.[20] The petitioner must detail information about the respondent including "the nature and degree of the alleged incapacity."[21] The court then appoints a visitor[22] and an expert "who has expertise in regard to the alleged or admitted incapacity."[23] The visitor interviews the respondent, along with "the person seeking appointment as guardian," and conducts any other interviews and "investigations necessary" to prepare a written report for the court.[24] The expert "examine[s]" the respondent and also prepares a written report for the court.[25] However, "[i]f the respondent stipulates to incapacity, the court may make a finding of incapacity without obtaining evidence from the expert."[26] The court then holds a hearing regarding incapacity and the petitioner has the "burden of proof by clear and convincing evidence."[27] At the hearing the respondent has the right to present evidence,

---

[19] *In re Protective Proc. of Nora D.*, 485 P.3d 1058, 1062 (Alaska 2021) (quoting *In re O.S.D.*, 672 P.2d 1304, 1306 (Alaska 1983)).

[20] AS 13.26.221(a).

[21] AS 13.26.221(b)(4).

[22] AS 13.26.005(12) (" '[V]isitor' means a person trained or experienced in law, medical care, mental health care, pastoral care, education, rehabilitation, or social work, who is an officer, employee, or special appointee of the court with no personal interest in the proceedings.").

[23] AS 13.26.226(c).

[24] *Id.*

[25] *Id.*

[26] AS 13.26.251(b).

[27] *Id.*

cross-examine witnesses, remain silent, and have the issue of incapacity "tried by [a] jury."[28]

If the court finds the respondent is incapacitated, the court must then "determine the extent of the incapacity and the feasibility of alternatives to guardianship to meet the needs of the respondent."[29] The court may only appoint a full guardian if it finds "that the respondent is totally without capacity to care for the respondent and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent."[30] Qualified family members have priority for appointment as guardian over the public guardian.[31] However, the court may decline to appoint a person with higher priority as a guardian if it is in the best interests of the respondent.[32] If the court appoints a guardian it must issue a guardianship order that includes its findings of fact, describes the authority of the guardian, and "adopts a guardianship plan."[33]

Within 90 days of the guardianship order the guardian must submit an implementation report detailing how the guardian will implement the guardianship plan.[34] Thereafter the guardian must submit a report annually and the visitor must file a report every three years.[35] If a petitioner seeks to change or terminate a guardianship, the "petitioner must first show that the circumstances of the ward, guardian, or conservator have changed materially since the guardian or conservator was

---

[28]    AS 13.26.251(a).

[29]    AS 13.26.251(c).

[30]    AS 13.26.251(f).

[31]    AS 13.26.311(d).

[32]    AS 13.26.311(f).

[33]    AS 13.26.266(a).

[34]    AS 13.26.271.

[35]    AS 13.26.276(a).

appointed."[36]  If "the petitioner demonstrates changed circumstances, the court must decide whether the existing appointment is in the ward's best interests."[37]  Moreover, "[u]pon the request of any interested person, or on the court's own motion, the court may set a review hearing to inquire as to the welfare and best interests of the respondent or ward and to take any other appropriate action necessary to protect the interests and welfare of the respondent or ward."[38]

**B.    It Was Error To Apply Issue Preclusion To Sasha's Incapacity.**

Collateral estoppel, or issue preclusion, applies where "a court has decisively adjudicated a particular factual or legal issue."[39]  It requires that four elements be met:

> (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved by the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[40]

Here, the superior court found that all four prongs of issue preclusion were satisfied with regard to Sasha's incapacity.  APS urges us to affirm the superior court's application of issue preclusion, arguing that Sasha was the same respondent in both cases,[41] her capacity was the same issue in 2012 as in 2022, her capacity was resolved

---

[36]    *H.C.S. v. Cmty. Advoc. Project of Alaska, Inc. ex. rel. H.L.S.*, 42 P.3d 1093, 1099 (Alaska 2002).

[37]    *Id.*

[38]    Alaska R. Prob. P. 14(b).

[39]    *Se. Alaska Conservation Council, Inc. v. State, Dep't of Nat. Res.*, 470 P.3d 129, 137 (Alaska 2020) (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010)).

[40]    *Sykes v. Lawless*, 474 P.3d 636, 643 (Alaska 2020) (quoting *Latham v. Palin*, 251 P.3d 341, 344 (Alaska 2011)).

[41]    Sasha does not dispute this element.

by a final judgment on the merits in 2012 because there was a proffer of uncontested evidence and the GAL agreed to the capacity finding, and the capacity finding was essential to the 2012 guardianship order.

We conclude that it was error to apply issue preclusion to the issue of Sasha's capacity because the issues in the two cases were not identical.[42] In determining whether an issue resolved in prior litigation is identical to the issue in the present case, we weigh a number of considerations, including:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?[43]

Here, the court lacked sufficient evidence to determine that the issues were identical. The 2012 determination of Sasha's incapacity was based on the initial petition, the court visitor's report, and the GAL's agreement that Sasha needed a guardian; there was no sworn testimony, no traditional evidence, and no expert report on Sasha's capacity.[44] In the 2022 proceedings, the court heard evidence from Sasha's

---

**42** The parties address the other elements of issue preclusion and whether the court abused its discretion in applying issue preclusion, but we do not reach these issues because we conclude the second element of issue preclusion is not met. *See Sykes*, 474 P.3d at 643.

**43** *Allstate Ins. Co. v. Kenick*, 435 P.3d 938, 945 (Alaska 2019) (quoting *Powercorp Alaska, LLC, v. Alaska Energy Auth.*, 290 P.3d 1173, 1182 (Alaska 2012)).

**44** These deficiencies also cast doubt on whether there was a final judgment on the merits in the 2012 case (the third prong of issue preclusion). Sasha did not formally stipulate to incapacity, so the court was technically required to appoint an expert and review the expert's report before making capacity findings, which it did not

medical providers, Skyler, and the court visitor, and considered the first court visitor report. However, the court did not appoint an expert to assess Sasha's capacity, even after the court visitor recommended Sasha receive updated evaluations on the extent of her cognitive challenges given that her most recent evaluations were done in 2002. We agree with Sasha that capacity is not necessarily static but can be a "fluid concept" that changes over time. It is possible that the facts regarding Sasha's capacity were the same in 2012 as in 2022, but there was not enough evidence before the court to determine that.

The guardianship statutes themselves reflect the possibility that capacity can change.[45] The superior court correctly noted that when a ward wishes to rely on such a change in capacity as a basis for terminating or changing a guardianship, the burden typically falls on the ward to prove that change.[46] But this is not a modification of a guardianship order. The 2012 guardianship was terminated in 2014 and it was APS, not Sasha, who petitioned for a *new* guardianship in 2022. It is therefore APS's

---

do. *See* AS 13.26.226(c); AS 13.26.251(b). The superior court reasoned that the GAL's testimony that it was "pretty obvious that a guardian is needed" essentially equated to a stipulation. But we have previously noted that "issue preclusion ordinarily does not attach [to a stipulation] unless it is clearly shown that the parties intended that the issue be foreclosed in other litigation." *Morris v. Horn*, 219 P.3d 198, 209 (Alaska 2009) (alteration in original). There is no evidence that the parties in 2012 intended the capacity finding to be preclusive. Because we hold that the capacity issue was not identical between the two proceedings, however, we do not reach the issue of whether the 2012 proceedings constituted a final judgment on the merits.

[45] *See* AS 13.26.286(b) (providing mechanism by which any "person interested in the ward's welfare" may petition for order that "the ward is no longer incapacitated or no longer incapacitated to the same extent as . . . when the original guardianship order was made").

[46] *See H.C.S. v. Cmty. Advoc. Project of Alaska, Inc. ex. rel. H.L.S.*, 42 P.3d 1093, 1099 (Alaska 2002) ("[I]n seeking a contested change of the guardian or conservator, a petitioner must first show that the circumstances . . . have changed materially.").

responsibility to prove that Sasha needs a guardian.[47] And in the intervening eight years there were no annual guardianship reports or visitor reports every three years, as there would have been if the guardianship had persisted.[48] There is therefore a dearth of evidence regarding Sasha's capacity from 2014 through 2022, which contributes to the difficulty in assessing whether the facts underlying the 2012 and 2022 capacity claims remained the same.

Capacity is "not an all or nothing proposition: An individual may lack capacity to manage some aspects of daily life while simultaneously having capacity to manage all other aspects."[49] The capacity finding is often a complex determination. Here, the court lacked sufficient evidence of how Sasha's capacity may have changed between 2012 and 2022 to determine whether the issues were identical for the purposes of issue preclusion.

We therefore reverse the court's application of issue preclusion to Sasha's capacity and remand for proceedings to determine her capacity.

## V.   CONCLUSION

We VACATE the superior court's order appointing a permanent guardian and REMAND for further proceedings.

---

[47]   AS 13.26.251(b).

[48]   *See* AS 13.26.276(a).

[49]   *In re Protective Proc. of Nora D.*, 485 P.3d 1058, 1064 (Alaska 2021) (citing AS 13.26.251(e)).